**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CRYSTAL MARLENA DAVIES, | CASE NO. 3:13-cv-2978-GBC |
| Plaintiff, | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 9, 10, 12, 13, 14 |

## MEMORANDUM

## I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Crystal Marlena Davies ("Plaintiff") for supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). Several related theories support a remand in this case. First, Plaintiff was a pro se claimant who exhibited mental illness. Thus, the ALJ had a heightened duty to develop the record both for and against the award of benefits. The ALJ failed to discharge this duty here because she did not request relevant medical evidence that Plaintiff submitted to the Appeals Council after obtaining counsel. Second, these records constitute new and material evidence. This evidence contains the only

opinion by a treating physician in the record. Moreover, this evidence is relevant to Plaintiff's social functioning, as it shows she was unable to exhibit the social skills required to successfully obtain treatment for her physical impairments. Thus, finally, this evidence calls into question the ALJ's assessment of her mental function, particularly her social limitations. The ALJ relied on an opinion by a state agency psychologist that Plaintiff's social skills were intact. The evidence submitted to the Appeals Council suggests this conclusion is not accurate. This evidence also demonstrates that the ALJ's failure to further explain and address Plaintiff's social impairments precludes meaningful review.

The Court notes that Plaintiff primarily focuses her appeal on physical, rather than mental, limitations. However, this focus may be a symptom of her mental illness. Providers observed that she lacked insight into her mental impairments and, although multiple providers diagnosed her with bipolar disorder, she consistently denied suffering from bipolar disorder. Plaintiff exhibited paranoid beliefs at the ALJ hearing. Thus, reliance on her representations that she was not suffering from a mental illness and her refusal to obtain treatment may be inappropriate in this case. For instance, Plaintiff asserts that she gets along with authority figures "fine," so the ALJ did not include limitations in her residual functional capacity ("RFC") relating to authority figures. However, Plaintiff was unable to get along with authority figures in the form of treating providers or state

agency personnel. Her lack of insight does not provide the ALJ's decision with substantial evidence. For the foregoing reasons, the Court will grant Plaintiff's appeal, vacate the decision of the Commissioner, and remand for further proceedings.

## II.    Procedural Background

On August 23, 2010, Plaintiff filed an application for SSI under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). (Tr. 92-98). On December 23, 2010, the Bureau of Disability Determination denied this application (Tr. 76-82), and Plaintiff filed a request for a hearing on February 22, 2011. (Tr. 83). On February 14, 2012, an ALJ held a hearing at which Plaintiff—who was not represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 31-75). On May 16, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 12-30). On July 12, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 7-8), which the Appeals denied on October 1, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On December 6, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On March 6, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs.9, 10). On April 10, 2014, Plaintiff filed a brief in support of

her appeal ("Pl. Brief"). (Doc. 12). On May 9, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 13). On May 22, 2014, Plaintiff filed a brief in reply ("Pl. Reply"). On December 8, 2014, the parties consented to transfer of this case to the undersigned for adjudication. (Doc. 16, 17, 18). The matter is now ripe for review.

## II.     Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## III.     Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the

claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## IV. Relevant Facts in the Record

Plaintiff was born on July 12, 1971, and was classified by the Regulations as a younger individual through the date of the ALJ decision. (Tr. 24). 20 C.F.R. § 404.1563. Plaintiff has at least a high school education and past relevant work as a sales associate, a waitress, and as a telemarketer. (Tr. 24).

On August 9, 2010, Plaintiff sought treatment at Geisinger Medical Center for a breast mass. (Tr. 368-70). Her history indicated that she had an abscess removed from her breast in April of 2010, with a history of breast disease and five

previous surgeries. (Tr. 368). Mental status examination indicated Plaintiff "appear[ed] quite angry and cynical." (Tr. 370).

Plaintiff also reported spine and lower extremity impairments. (Tr. 606). MRIs documented a Tarlov cyst. (Tr. 606). On October 5, 2010, Dr. Thomas Hanlon described her history:

> Near total body pain. Began after I & D left breast abscess (The breast still has an open wound that is slowly resolving). She developed left leg radicular symptoms. Had an MRI of the LS spine that showed a left L5 Tarlov's cyst. She found the Tarlov's Disease organization and the National Organization for Rare Diseases (NORD). Patient feels she has all the hallmarks of the Tarlov's Disease. She currently is being worked up By Dr Casmpos at Geisinger Neurosurgery for her left leg radicular symptoms and variable urologic complaints. She has a bizarre left buttock/rectum feeling of labor. Also c/o tinnitus and headaches. The discomfort is most prominent in the lower, left lumbar spine. This radiates to the left posterior thigh. She characterizes it as intermittent, moderate in intensity, severe, aching, burning, stabbing, and cramping. This is a chronic problem, with essentially constant pain. She states that the current episode of pain started 6 months ago. The event which precipitated this pain was began after breast surgery. Associated symptoms include radicular bilateral arm pain and radicular bilateral leg pain. She denies fever, unexplained weight loss, change in bowel or bladder habits or increased pain with Valsalva maneuvers. She notes some pain relief with lays down. The pain worsens with movement/lifting/walking… EMG/NCV has been attempted without success due 10 patient anxiety.

(Tr. 208). Neurologists subsequently opined that her "left lower extremity symptoms [were] present in a distribution compatible with the left S1 region Tarlov cyst," although "[t]he relationship to symptoms to this finding is not entirely clear." (Tr. 606).

On August 23, 2010, a state agency employee conducted a face-to-face interview to complete Plaintiff's application for benefits under the Act. (Tr. 116). The state agency employee observed that she "could not sit for long periods of time because she claimed her foot was going numb" and "had a bad memory." (Tr. 116). Notes also indicate that Plaintiff "was not very cooperative or friendly. She brought a friend with her because she "hates everyone" and her friend would act as a buffer. Was very sarcastic in answering questions." (Tr. 116).

On August 26, 2010, a state agency employee contacted Plaintiff by phone and noted that she "very sarcastic and somewhat unfriendly, but also somewhat tearful about her conditions." (Tr. 526).

On October 14, 2010, a state agency employee made a notation of Plaintiff's file that "there are no guarantees of obtaining a detailed true clinical picture of her mental status given the gravity of her past conditions, so a protective MSE CE is ordered today. It is noted that the most recent mental status comment on an 8/9/10 consult at Geisinger noted her to be quite angry and cynical, and sarcastic responses to questions have been noted by the field office and noticed by the adjudicator. Her ADL also alleges memory problems, and in speaking to the adjudicator by telephone today, she alleged "I can't remember (expletive)," saying she needs to write information on her arm to remember." (Tr. 527).

In October of 2010, Plaintiff had a psychiatric evaluation at Northeast Counseling. (Tr. 202).  When asked if Plaintiff had any goals, she responded, "ask f****** retarded questions to someone else." (Tr. 202). When asked if she was going to kill herself, she responded, "what a ridiculous question. As per usual." (Tr. 199). She felt "these are all ridiculous questions." (Tr. 199).  She indicated that the "main reason she was there" was Dr. Yurko and evaluators observed she had poor insight. (Tr. 195). She had a "history of getting into fights with others." (Tr. 195). She was "irritable" during most of the interview. (Tr. 196).

On November 23, 2010, a state agency employee contacted Plaintiff to see if she would keep a scheduled consultative examination, and she explained that she would be unable to if she did not have a ride. (Tr. 527). The state agency employee noted Plaintiff "seemed very sarcastic and combative about keeping this exam appointment." (Tr. 527).

On November 30, 2010, Dr. Anthony Galdieri, Ph.D., reviewed Plaintiff's file and authored a medical opinion. (Tr. 513). He opined that Plaintiff had moderate limitations in accepting instructions and responding appropriately to criticism from supervisors. (Tr. 513). He opined that her "social skills are functional from a psychiatric standpoint" and that she could perform the basic mental demands on competitive work on a sustained basis. (Tr. 514).

On February 14, 2012, Plaintiff appeared and testified at a hearing before an ALJ. (Tr. 33). She did not appear to recognize the import of the state agency medical opinions, testifying that:

> CLMT: Well, there's two doctors on the disc that I've never heard of.
> ALJ: Okay.
> CLMT: And I wrote their names down because I never heard of them. And Dr. Mark Bohn, M.D.
> ALJ: How do you spell that?
> CLMT: B-O-H-N. I have no idea who he is. And Anthony Galdieri, Ph.D., I've never heard of him either.
> ALJ: Ph.D.?
> CLMT: And Mark Bohn is an M.D. Mark Bohn.
> ALJ: Okay, Mark -- Michael Bohn? No. We have a Michael Bohn who's -- that wasn't it?
> CLMT: No.
> ALJ: Okay.
> CLMT: His name's Mark Bohn, B-O-H-N. I have no idea who he is.
> ALJ: It could be the doctors from the state agency. Let me see. Yeah. Anthony Galdieri is from the Social Security Administration component that made your original decision.
> CLMT: Okay.
> ALJ: That's where he is from. And Mark Bohn is also from the state agency. One is a medical doctor and the other one's the psychologist.
> CLMT: Okay.
> ALJ: Okay? Do you have any objections to us considering your records?
> CLMT: No.
> ALJ: Okay. Therefore, Exhibits 1A through 23F are admitted into evidence.

(Tr. 37-39). Plaintiff testified that "everything hurts most of the time," which she attributed to her cyst. (Tr. 42). She testified that waiting for doctors to become available was "really frustrating." (Tr. 43). She testified that had gone to Northeast

Counseling until November of 2011, but stopped due to transportation problems. (Tr. 44). She criticized her medical care, stating "I need better doctors. This is what all this experience is teaching me." (Tr. 54). When asked about mental health impairments, she testified:

> Q Now, let's talk about the mental health treatment.
> A Yeah, they keep telling me I'm bipolar. hearing this for years. I am not bipolar.
> Q What's your mental health diagnosis then?
> A Bipolar.
> Q Anything else?
> A Bipolar.
> Q Just bipolar, okay.
> A The them who are bipolar are erratic and have really like extreme highs and extreme lows, which I do not have. Moody, that I have. Not the same.
> Q So, part of the bipolar is manic episodes.
> A Yeah, I don't have those.
> Q You don't have those, okay.
> A No. But I'd sign up I think after this. Can I walk around over here?
> Q I need you stay by the microphone just so we can hear you and he can record it. And what medications are you on or the mood swings or
> A Nothing.
> Q -- whatever you want to call it? Okay. Have you had any psychiatric hospitalizations since March 2010?
> A No.
> Q And you say you were in counseling but you don't do that any more because you moved.
> A Correct.
> Q Did you ever take medication for?
> A I did twice, and I'll never take it again because my first experience is with Serzone, and I told Dr. Sperazza that it made me so suicidal I felt like driving my car off the Weatherly Hill Climb, and her answer to me was, "Oh, take more." That ended really well for me. And my second experience was Abilify, which was a complete disaster. And I'm pretty sure they're so bad for me because, really, I don't have bipolar, I'm just moody.

> Q Okay. Now, do you have problems concentrating?
> A Yes.
> Q Can you give me an example of when you lose concentration, of something you're doing and you lose concentration?
> A I lose my train of thought when talking. I do that a lot. I'll be telling somebody something, and I'll just stop and I won't finish it. I'm like not even aware that I do it until the person I'm talking to points it out. And they're like, "You didn't finish your story," I'll be like, "Oh."
> Q Are you able to follow the plot of a TV show?
> A I don't know how to answer that. Yes, I could follow the plot, but if we're watching a show that goes consecutively and I need to know what happened in the last episode, I usually have to like watch part of the last episode to see what happened because I don't remember. And I don't mean like a week. Like, we don't have cable, so, we watch the stuff on Hulu. So, as an example, we're watching the "Hero" series now, and where we ended the last episode last night, I will have to go back and see what happened before I could continue because I could not tell you right now, and that was only from last night. I have no idea.
> Q Do you do any reading books or magazines?
> A I'm not really any more. I used to be a really avid reader. I probably stopped reading about eight months ago because I'm not retaining what I read.

(Tr. 57). She testified that she sleeps "a lot" during the day, up to four hours, and "wake[s] up mad." (Tr. 62). She explained that she did not sleep well. (Tr. 65). She testified that she was "not planning on" getting any additional mental health treatment. (Tr. 65). She also testified that she thought the FDA was watching her credit card, discovered she was using Darvocet, and pulled it from the market. (Tr. 49).

The ALJ issued a decision denying benefits on May 16, 2012. (Tr. 26). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful

activity since August 23, 2010, the application date. (Tr. 17). At step two, the ALJ found that Plaintiff's Tarlov's cyst, bipolar disorder, history of poly substance abuse, and a recurrent breast abscess were medically determinable and severe. (Tr. 17). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 17). The ALJ found that she had mild limitation in activities of daily living and moderate limitations in maintaining concentration, persistence, and pace and social functioning. (Tr. 18). The ALJ explained that:

> In social functioning, the claimant has moderate difficulties. The claimant states that she gets along with authority figures "fine," but has problems getting along with family, friends, and neighbors, as her "family thinks (her) health issues are immaturity." She also reports not having a social life, but states that she does spend time with others when "they come to check on (her)"

(Tr. 19-20). The ALJ found that Plaintiff had the RFC to:

> [P]erform a range of sedentary work as defined in 20 CFR 416.967(a) except she is unable to push or pull with the left shoulder or the left leg. She can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She can occasionally reach overhead with the left upper' extremity. Environmentally, she must avoid concentrated exposure to vibration and hazards. She can understand, remember, and carry out simple instructions, and she can have occasional interaction with coworkers and the public.

(Tr. 19). The ALJ did not include a limitation to interacting with supervisors. (Tr. 20). The ALJ summarized the medical evidence relating to Plaintiff's physical impairments as follows:

The claimant claims to have back pain radiating into her leg since her breast mass was removed. As such, she was referred to pain management physician, Dr. Thomas W. Hanlon, in October 2010. Treatment records from Dr. Hanlon note that the claimant had complaints of whole body pain, and that she had developed left leg radicular symptoms. She also reported a left buttock/rectum feeling of labor, as well as headaches, tinnitus, and discomfort of the lower lumbar spine, which she stated began after her breast surgery. She also reported associated symptoms of radicular bilateral arm pain and bilateral leg pain. Dr. Hanlon reviewed an MRI of the lumbar spine obtained in September 2010 that showed a Tarlov's cyst. However, physical examination was essentially normal. The claimant had a normal gait, muscle strength was 5/5 in all major muscle groups, and there was no scoliosis or other abnormal spinal curvatures. The claimant was alert and oriented. Her cranial nerves were grossly intact; she had normal sensation, normal reflexes, and normal memory, speech, and demeanor. Dr. Hanlon diagnosed the claimant with low back pain and lumbosacral radiculitis (Exhibit 3F).

Treatment records from the physicians at Geisinger confirm the claimant's complaints, but there is not much in the way of objective findings. Likewise, MRI studies do not support a finding of disability, and there is no electromyography (EMG) study to confirm nerve damage or radiculopathy in the record (Exhibits 25F and 26F).

Treatment records from neurologist, Dr. James F. Hora, dated October 17,2011, note the claimant was being seen for complaints of memory loss and gait disturbance. Physical examination this date revealed the claimant's motor strength to be 5/5 in all extremities and her coordination was intact. She did have some hyperreflexic deep tendon reflexes at the knees and sensation was somewhat decreased to the medial aspect of the bilateral lower extremities, however, her gait and stance were stable. Upon mini-mental status examination, the claimant scored 29/30. She knew recent events in the news, breakfast she had that morning, and supper she had the night before. There was no evidence of memory loss. Dr. Hora's impression of the claimant was that she suffered from the subjective complaint of memory loss as well as neuropathy with gait disturbance (Exhibit 26F).

(Tr. 21). The ALJ summarized the evidence relating to Plaintiff's mental health treatment as follows:

> Mental health treatment with Northeast Counseling Services in October 2010 notes that the claimant indicated she suffered from a rare disease called Tarlov cyst, which is a spinal cyst with cerebral fluid leaking and causing pain in her legs as well as numbness, and that she suffered from a breast infection. She stated that she was not depressed, but frustrated and angry, because her son has to do everything, like laundry and cook. However, she reported no problems with emotions, but stated that her sleep was not good because of pain. She also reported that she had just stopped drinking two months prior, but that she used to drink heavily before that, in addition to doing marijuana and cocaine until about 1994 or so. The claimant was diagnosed with bipolar disorder and a history of polysubstance and alcohol dependency. She was given a global assessment of functioning (GAF) score of 55 (Exhibits 2F and 24F), consistent with the undersigned's assessed residual functional capacity. Mental status examinations do not support a claim for disability.

(Tr. 22). The ALJ assigned "significant weight" to the GAF score of 55, explaining that it indicated "only moderate difficulty in social, occupational, or school functioning such as few friends, or conflicts with peers or co-workers." (Tr. 23). The ALJ concluded that this was consistent with Plaintiff's lack of mental health treatment or psychiatric medications during the relevant period. (Tr. 23). The ALJ assigned great weight to a state agency psychologist who opined that Plaintiff could perform simple work and that her social skills were functional. (Tr. 24, 513). At step four, the ALJ found that Plaintiff could not perform her past relevant work. (Tr. 24). At step five, the ALJ found that Plaintiff could perform other work in the

national economy. (Tr. 24). Consequently, the ALJ determined that Plaintiff was not disabled within the meaning of the Act and not entitled to benefits. (Tr. 25).

After the ALJ decision, Plaintiff obtained counsel and submitted additional evidence to the Appeals Council. (Tr. 660-730). This evidence included an opinion from treating source Dr. George Yurko, D.O., that Plaintiff:

> [W]ould have a difficult time sustaining any lengthy time on her feet or any lengthy time sitting, and would be limited considerably in her ability to lift, bend or perform other maneuvers that would require engagement of her low back muscles. I am, therefore, also of the opinion that the symptom complex that she exhibits would likely make it impossible for her to engage in any gainful employment no matter how sedentary.

(Tr. 662). He explained that, "it does appear that it is within a reasonable degree of medical certainty that the Tarlov cyst can be causing left Sl nerve root irritation with radicular pain down the leg." (Tr. 662). Dr. Yurko also noted that Dr. Hora would no longer see Plaintiff "because of some behavioral problems that occurred." (Tr. 662).

The new evidence contains notes from Dr. Hora that he would not see Plaintiff anymore and that her primary care provider needed to "arrange psychiatric evaluation." (Tr. 714). He explained that:

> During the intake interview with the nurse the patient became rude and aggressive. The nurse was so concerned that she left the exam room and came to my office. She told that this behavior had occurred and that she was very uncomfortable staying in the room alone and would not continue the rooming process. I went to the room and asked what the problem was and she was clearly agitated about something,

She said her bad mood was contagious. I told her that I would not see
her with this kind of behavior and asked her to leave the clinic.

(Tr. 714).

These records include a pulmonary clinic consultation that indicated Plaintiff
was "not getting along with her parents," had "severe anxiety," and felt "like
jumping out of [her] skin every morning." (Tr. 704). Plaintiff demonstrated
"inappropriate laughter as well as flight of ideas." (Tr. 704). Mental status
examination indicated pressured speech. (Tr. 705). Plaintiff was "initially not
cooperative with the lung exam[ination]." (Tr. 705). She had "multiple breakdowns
while describing her family….and certainly has significant anxiety." (Tr. 705). Her
pulmonologist opined "that her anxiety and her psychiatric symptoms are playing a
major role rather than her asthma" in her pulmonary complaints and that "she
clearly needs…psychiatric consultation." (Tr. 705). These records also include
notes from Dr. McMurry that "memory problems persist." (Tr. 710-17).

## V.     Plaintiff Allegations of Error

Several related theories support a remand in this case. First, Plaintiff was a
pro se claimant who exhibited mental illness. Thus, the ALJ had a heightened duty
to develop the record both for and against the award of benefits. The ALJ failed to
discharge this duty here because she did not request the relevant medical evidence
Plaintiff submitted to the Appeals Council after obtaining counsel. Second, these
records constitute new and material evidence. This evidence contains the only

opinion by a treating physician in the record. Moreover, this evidence is relevant to Plaintiff's social functioning, as it shows she was unable to exhibit the social skills required to successfully obtain treatment for her physical impairments. Thus, finally, this evidence calls into question the ALJ's assessment of her mental function, particularly her social limitations. The ALJ relied on an opinion by a state agency psychologist that Plaintiff's social skills were intact. The evidence submitted to the Appeals Council suggests this conclusion is not accurate. This evidence also demonstrates that the ALJ's failure to further explain and address Plaintiff's social impairments precludes meaningful review.

The Court notes that Plaintiff primarily focuses her appeal on physical, rather than mental, limitations. However, this focus may be a symptom of her mental illness. Providers observed that she lacked insight into her mental impairments and, although multiple providers diagnosed her with bipolar disorder, she consistently denied suffering from bipolar disorder. Thus, reliance on her representations that she was not suffering from a mental illness and her refusal to obtain treatment may be inappropriate in this case. For instance, Plaintiff asserts that she gets along with authority figures "fine," so the ALJ did not include limitations in her residual functional capacity ("RFC") relating to authority figures. However, Plaintiff was unable to get along with authority figures in the form of treating providers or state agency personnel. Her lack of insight does not provide

the ALJ's decision to exclude additional social limitations with substantial evidence.

Plaintiff did not specifically allege these issues, but did generally allege that the ALJ should have considered the evidence that was before the Appeals Council. (Pl. Brief); (Pl. Reply). Given that she proceeds pro se, that is sufficient. As the Third Circuit explained in *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244 (3d Cir. 2013):

> [W]e tend to be flexible when applying procedural rules to pro se litigants, especially when interpreting their pleadings. *See, e.g., Higgs v. Att'y Gen.,* 655 F.3d 333, 339 (3d Cir.2011) ("The obligation to liberally construe a *pro se* litigant's pleadings is well-established."). This means that we are willing to apply the relevant legal principle even when the complaint has failed to name it. *Dluhos v. Strasberg,* 321 F.3d 365, 369 (3d Cir.2003). And at least on one occasion, we have refused to apply the doctrine of appellate waiver when dealing with a pro se litigant. *Tabron v. Grace,* 6 F.3d 147, 153 n. 2 (3d Cir.1993). This tradition of leniency descends from the Supreme Court's decades-old decision in *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). In *Haines,* the Court instructed judges to hold pro se complaints "to less stringent standards than formal pleadings drafted by lawyers." *Id.* at 520, 92 S.Ct. 594; *see Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007).

*Id.* at 244.

An ALJ must sufficiently develop the record. As the Third Circuit explained in *Ventura v. Shalala*, 55 F.3d 900 (3d Cir. 1995):

> ALJs have a duty to develop a full and fair record in social security cases. *See Brown v. Shalala,* 44 F.3d 931, 934 (11th Cir.1995); *Smith v. Harris,* 644 F.2d 985, 989 (3d Cir.1981). Accordingly, an ALJ must

secure relevant information regarding a claimant's entitlement to social security benefits. *Hess,* 497 F.2d at 841. In *Hess* we reasoned that "[a]lthough the burden is upon the claimant to prove his disability, due regard for the beneficent purposes of the legislation requires that a more tolerant standard be used in this administrative proceeding than is applicable in a typical suit in a court of record where the adversary system prevails." *Id.* at 840.

*Id.* at 902. "It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel,* 530 U.S. 103, 111, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). ALJs owe a heightened duty to pro se claimants, as the Third Circuit explained in *Reefer v. Barnhart*, 326 F.3d 376 (3d Cir. 2003):

> An ALJ owes a duty to a *pro se* claimant to help him or her develop the administrative record. "When a claimant appears at a hearing without counsel, the ALJ must 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.' " *Key v. Heckler,* 754 F.2d 1545, 1551 (9th Cir.1985) (quoting *Cox v. Califano,* 587 F.2d 988, 991 (9th Cir.1978)); *Dobrowolsky,* 606 F.2d at 407 (noting that an ALJ must "assume a more active role when the claimant is unrepresented"). *See generally Ventura v. Shalala,* 55 F.3d 900, 902 (3d Cir.1995) ("ALJs have a duty to develop a full and fair record in social security cases.")

*Id.* at 380.

Similarly, remand may be appropriate if a claimant produces new and material evidence that was not before the ALJ. When the Appeals Council denies review, evidence that was not before the ALJ may only be used to determine whether it provides a basis for remand under sentence six of section 405(g), 42 U.S.C. ("Sentence Six"). *See Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984); *Matthews v. Apfel*, 239 F.3d 589, 591-92 (3d Cir.

2001). Sentence Six requires a remand when evidence is "new" and "material" if the claimant demonstrated "good cause" for not having incorporated the evidence into the administrative record. *Id.* In order to be material, "the new evidence [must] relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Id.* The relevant time period is "the period on or before the date of the [ALJ's] hearing decision." 20 C.F.R. § 404.970(b); *Mathews*, 239 F.3d at 592. The materiality standard "requires that there be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination." *Szubak*, 745 F.2d at 833.

An ALJ must provide a sufficient explanation for a denial of benefits. The Third Circuit held in *Adorno v. Shalala*, 40 F.3d 43 (3d Cir. 1994) that:

> [T]he Secretary must "explicitly" weigh all relevant, probative and available evidence. *Dobrowolsky v. Califano,* 606 F.2d 403, 407 (3d Cir.1979); *see also Brewster v. Heckler,* 786 F.2d 581, 584 (3d Cir.1986); *Cotter,* 642 F.2d at 705. The Secretary must provide some explanation for a rejection of probative evidence which would suggest a contrary disposition. *Brewster,* 786 F.2d at 585. The Secretary may properly accept some parts of the medical evidence and reject other parts, but she must consider all the evidence and give some reason for discounting the evidence she rejects. *Stewart v. Secretary of H.E.W.,* 714 F.2d 287, 290 (3d Cir.1983)

*Id.* at 48; *see also Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504-05 (3d Cir. 2009) ("The ALJ must provide a 'discussion of the evidence' and an 'explanation of reasoning' for his conclusion sufficient to enable meaningful judicial review")

(quoting *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000));

*Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

Here, the ALJ failed to sufficiently develop the record, which resulted in evidentiary gaps. *Reefer v. Barnhart*, 326 F.3d 376 (3d Cir. 2003). Plaintiff's mental illness makes this failure more acute. *See Plummer v. Apfel*, 186 F.3d 422, 434 (3d Cir. 1999) ("The ALJ has a duty to develop the record when there is a suggestion of mental impairment by inquiring into the present status of impairment and its possible effects on the claimant's ability to work."). Plaintiff did not appear to recognize the need for a medical opinion or the importance of the state agency medical opinions in the file. (Tr. 37). She testified:

> CLMT: Well, there's two doctors on the disc that I've never heard of.
> ALJ: Okay.
> CLMT: And I wrote their names down because I never heard of them. And Dr. Mark Bohn, M.D ..
> ALJ: How do you spell that?
> CLMT: B-O-H-N. I have no idea who he is. And Anthony Galdieri, Ph.D., I've never heard of him either.
> ALJ: Ph.D.?
> CLMT: And Mark Bohn is an M.D. Mark Bohn.
> ALJ: Okay, Mark -- Michael Bohn? No. We have a Michael Bohn who's -- that wasn't it?
> CLMT: No.
> ALJ: Okay.
> CLMT: His name's Mark Bohn, B-O-H-N.
> I have no idea who he is.
> ALJ: It could be the doctors from the state agency. Let me see. Yeah. Anthony Galdieri is from the Social Security Administration component that made your original decision.
> CLMT: Okay.

> ALJ: That's where he is from. And Mark Bohn is also from the state
> agency. One is a medical doctor and the other one's the psychologist.
> CLMT: Okay.
> ALJ: Okay? Do you have any objections to us considering your
> records?
> CLMT: No.
> ALJ: Okay. Therefore, Exhibits 1A through 23F are admitted into
> evidence.

(Tr. 37-39). The ALJ did not explain that Dr. Bohn and Dr. Galdieri had provided medical opinions that Plaintiff was not disabled, that disability cases often turn on medical opinions, or that Plaintiff could obtain medical opinions from her own treating physicians. *Id.*

Moreover, the evidence submitted to the Appeals Council is new, not cumulative, and material. Defendant asserts that the evidence is not new because it "rehashes" treatment records that were before the ALJ. (Def. Brief at 21-23). However, the evidence also contains an interpretation and opinion by a treating physician, which was not before the ALJ. *See Puterbaugh v. Colvin*, 1:14-CV-1134, 2015 WL 4730068, at *11 (M.D. Pa. Aug. 10, 2015) (Treating physician opinion submitted to the Appeals Council was new and material because "[t]he Regulations and Third Circuit case law, as described above, also place heavy emphasis on opinions from treating sources. Thus, a treating source opinion that Plaintiff could not perform… work raises a reasonable possibility that the outcome would be different.") (citing *Mathews*, 239 F.3d at 592).

Defendant contends that Dr. Yurko's opinion is not material simply because it was authored outside the relevant period. (Def. Brief 22). However, medical evidence that is not from a relevant period can still be probative of disability during the relevant period. In fact, the Regulations and case law require the ALJ to consider non-contemporaneous evidence. For instance, the Regulations require the ALJ to evaluate the medical records for at least twelve months prior to an application for SSI, even though benefits for SSI may not be awarded until the month after the application. 20 C.F.R. § 416.912(d) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application."); *see also* 20 C.F.R. § 404.1512(d). There is no exception to this requirement in the Regulations for cases with a previously adjudicated claim within twelve months.

Similarly, SSR 83-20 requires the ALJ to consider non-contemporaneous evidence when a claimant alleges disability due to a slowly progressing disease with an onset prior to the earliest available evidence. SSR 83-20; *Newell v. Comm. of Social Security*, 347 F.3d 541, 547 (3d Cir. 2003) ("[E]ven non-contemporaneous records of Newell's liver disease, diabetes, and neuropathy are

relevant to the determination of whether their onset occurred by the date Newell alleges. Here, the ALJ failed properly to consider the non-contemporaneous evidence presented by Newell in order to perform a retrospective analysis.") (citing *Ivy v. Sullivan,* 898 F.2d 1045, 1049 (5th Cir.1990)). Non-contemporaneous evidence also assists an ALJ understand the course of a claimant's impairments. SSR 96-7p ("Apart from the medical signs and laboratory findings, the medical evidence, especially a longitudinal medical record, can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms. Important information about symptoms recorded by medical sources and reported in the medical evidence may include…course over time (e.g., whether worsening, improving, or static)").

Moreover, the new evidence demonstrates Plaintiff's difficulty with social interaction. Dr. Yurko also noted that Dr. Hora would no longer see Plaintiff "because of some behavioral problems that occurred." (Tr. 662). Dr. Hora explained that:

> During the intake interview with the nurse the patient became rude and aggressive. The nurse was so concerned that she left the exam room and came to my office. She told that this behavior had occurred and that she was very uncomfortable staying in the room alone and would not continue the rooming process. I went to the room and asked what the problem was and she was clearly agitated about something, She said her bad mood was contagious. I told her that I would not see her with this kind of behavior and asked her to leave the clinic.

(Tr. 714). Plaintiff's pulmonologist noted "not getting along with her parents," had "severe anxiety," and felt "like jumping out of [her] skin every morning." (Tr. 704). Plaintiff demonstrated "inappropriate laughter as well as flight of ideas." (Tr. 704). Mental status examination indicated pressured speech. (Tr. 705). Plaintiff was "initially not cooperative with the lung exam[ination]." (Tr. 705). She had "multiple breakdowns while describing her family….and certainly has significant anxiety." (Tr. 705). Her pulmonologist opined "that her anxiety and her psychiatric symptoms are playing a major role rather than her asthma" in her pulmonary complaints and that "she clearly needs…psychiatric consultation." (Tr. 705).

The ALJ relied on Plaintiff's lack of mental health treatment or psychiatric medications during the relevant period. (Tr. 23). However, the ALJ failed to consider whether lack of insight, rather than lack of disability, was the cause of her conservative treatment. SSR 96-7p. Plaintiff's lack of insight into her mental health does not necessarily render her less credible or not disabled. *See e.g.*, *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) ("it is common knowledge that depression is one of the most underreported illnesses in the country because those afflicted often do not recognize that their condition reflects a potentially serious mental illness."); *Kegler v. Colvin*, No. 12-CV-413-WMC, 2014 WL 4538117, at *1 (W.D. Wis. Sept. 11, 2014); *Quillin v. Astrue*, No. 2:10-CV-037, 2011 WL 9004, at *8-10 (E.D. Tenn. Jan. 3, 2011); *Reid v. Astrue*, No. 1:07-CV-0577(LEK),

2010 WL 2594611, at *9 (N.D.N.Y. June 23, 2010); *Oppegaard v. Astrue*, No. C09-768-JPD, 2010 WL 1406379, at *9 (W.D. Wash. Mar. 31, 2010); *Leon v. Astrue*, No. 08 C 7430, 2010 WL 934043, at *4 (N.D. Ill. Mar. 5, 2010); *Shore v. Callahan*, 977 F. Supp. 1075, 1079 (D. Or. 1997); *Mauro v. Comm'r of Soc. Sec.*, No. 07-12095, 2008 WL 495362, at *4 (E.D. Mich. Feb. 20, 2008) ("Plaintiff is not a malingerer; indeed, he seems to downplay his impairments"). Defendant does not contend that the records were omitted without good cause. (Def. Brief). Thus, remand is appropriate pursuant to Sentence Six.

The ALJ also does not mention significant evidence relevant to Plaintiff's mental state. *See Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). For instance, during the psychiatric evaluation at Northeast Counseling, when asked if Plaintiff had any goals, she responded, "ask f****** retarded questions to someone else." (Tr. 202). When asked if she was going to kill herself, she responded, "what a ridiculous question. As per usual." (Tr. 199). She felt "these are all ridiculous questions." (Tr. 199). She indicated that the "main reason she was there" was Dr. Yurko and evaluators observed she had poor insight. (Tr. 195). She had a "history of getting into fights with others." (Tr. 195). She was "irritable" during most of the interview. (Tr. 196). The ALJ also did not mention the multiple, consistent observations of state agency employees that she was combative, "very sarcastic and unfriendly." (Tr. 526-27). *See* SSR 96-7 ("The adjudicator must also consider

any observations about the individual recorded by Social Security Administration (SSA) employees during interviews, whether in person or by telephone. In instances where the individual attends an administrative proceeding conducted by the adjudicator, the adjudicator may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements.").

Thus, the Court remands pursuant to *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981); *Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984); and *Reefer v. Barnhart*, 326 F.3d 376 (3d Cir. 2003). On remand, the ALJ will be required to consider the evidence submitted to the Appeals Council, particularly Dr. Yurko's opinion regarding her physical impairments, and sufficiently explain how limitations in the RFC account for Plaintiff's social limitations.

## VII.     Conclusion

The Court finds that the ALJ's decision lacks substantial evidence because the ALJ failed to properly evaluate the full record of medical evidence. Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order in accordance with this Memorandum will follow.

Dated: September 30, 2015        *s/Gerald B. Cohn*
GERALD B. COHN
UNITED STATES MAGISTRATE JUDGE